UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-80895-CIV-MIDDLEBROOKS

CPL MEDIA GROUP, INC.,
and MICHELLE LARKIN,

      Plaintiff(s)

vs.

IRVING FREIBERG, SCOTT FREIBERG,
ABBEY FREIBERG, ABBEYSCO, LLC, and
LONE STAR BRANDS, LLC,

      Defendant(s).

_____/

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF CPL'S VERIFIED
MOTION FOR TEMPROARAY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION WITH MEMORANDUM OF LAW**

IRVING FREIBERG ("**Irving**"), SCOTT FREIBERG ("**Scott**"), ABBEY FREIBERG

("**Abbey**"), ABBEYSCO, LLC ("**Abbeysco**"), and LONE STAR BRANDS, LLC ("**Lone Star**";

hereinafter collectively with Irving, Scott, Abbey and Abbeysco referred to as the

"**Defendants**"), by and through undersigned counsel, hereby file this Response in Opposition to

Plaintiff CPL's (sic) Verified Motion for Temporary Restraining Order and Preliminary

Injunction with Memorandum of Law (the "Motion"), and respectfully states the following:

**FACTUAL BACKGROUND**

CPL MEDIA GROUP, INC. ("**CPL**" or "**Plaintiff**") and MICHELLE LARKIN

("**Larkin**"; collectively with CPL hereinafter referred to as "**Plaintiffs**") along with Irving and

Scott began developing a website wherein a person can enter a sweepstakes and potentially win a

prize in exchange for consent to receive advertisements via E-mail.

Irving has been in the on-line marketing business for a number of years and cultivated many relationships with website developers, affiliate companies and other services necessary to create and maintain such business operations. Many of the services the Plaintiff was using were due to Irving's relationships with these companies.

In addition, the Plaintiff and Defendant never entered into any agreement of any kind. There are no non-compete, non-solicitation, or non-disclosure agreement of between the Plaintiffs and the Defendants. In fact, three out of the five Defendants, Abbey, Abbeysco and Lone Star have never had any type of relationship with the Plaintiffs. Likewise, the Plaintiff never entered into any agreements with the affiliates, these are "at will" relationships where an account is open to track the traffic generated by a specific site and commissions are paid based on the traffic and leads that are generated. There are certain terms by which each party must conduct it business, but there is not a time by which a service must be completed or any notice or reason necessary for terminating use of the account by either party. A True and correct copy of the Terms and Conditions of Flex Marketing are attached hereto as Exhibit "A".

Furthermore, the Plaintiffs arguments are replete with inaccuracies, the Defendants in no way caused the accounts with the affiliates to be shut down, rather it is the belief of the Defendants that the affiliate accounts were shut down due to non-payment from the Plaintiff.

## LEGAL ARGUMENT

The Plaintiff brings a legally deficient; the Plaintiff is not looking to enjoin future potential harm, rather it is attempting to use an injunction to get relief from alleged past acts done by the Defendants. Further, the Plaintiff cannot meet the high burden of showing a substantial likelihood of prevailing on the issues necessary for the entry of a preliminary injunction.

1. <u>**A Preliminary Injunction Cannot Issue As The Plaintiff is Seeking to Enjoin Competition and Remedy Past injuries**</u>

The Plaintiff is seeking a preliminary injunction prohibiting the Defendants from conducting business for allegedly interfering with the Plaintiff's business relationships and using data allegedly taken from the Plaintiff's Servers.  The Plaintiff is essentially asking this Court to impose the obligations of non-compete, non-solicitation and non-disclosure agreements on all of the Defendants in a case where no such agreements exist.  "Competition for business by a competitor is not actionable, even if intentional, unless the competitor is attempting to induce a customer to breach a contract that is not terminable at will."  <u>Advantage Digital Sys., Inc. v. Digital Imaging Servs., Inc.</u>, 870 So. 2d 111, 116 (Fla. 2d DCA 2004)(internal citations omitted).  Accord, <u>Jay v. Mobley</u>, 783 So.2d 297 (Fla. 4th DCA 2001).

A review of the Complaint and the Motion show on their face that the true intent of the Plaintiff is to remedy past injuries.  The requested relief in the Plaintiff's Motion all reference relief from actions the Plaintiff alleges has already occurred.  See, Pl.'s Mot. Prelim. Inj., p. 20-22.  Because the relief the Plaintiff is seeking is not forward looking to some imminent harm, the entry of a preliminary injunction should not be granted by the Court.

2. <u>**The Plaintiff Bears a High Burden to Demonstrate entitlement to Injunctive Relief**</u>

"[A preliminary injunction] 'is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to all four elements.'"  <u>Alejandro v. Palm Beach State College</u>, 843 F.Supp. 2d 1263, 1269 (S.D.Fla. 2011)(Middlebrooks, J.)(citing <u>Davidoff & CIE, SA v. PLD Int'l Corp.</u>, 263 F.3d 1297, 1300 (11th Cir.2001) (quoting <u>Siegel v. LePore</u>, 234 F.3d 1163, 1176 (11th Cir.2000) (en banc)).  As Justice Baldwin, sitting on the Circuit Court for the District of New Jersey wrote 172 years ago,

> There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. The right must be clear, the injury impending or threatened, so as to be averted only by the protecting preventive process of injunction: but that will not be awarded in doubtful cases, or new ones, not coming within well established principles; for if it issues erroneously, an irreparable injury is inflicted, for which there can be no redress, it being the act of a court, not of the party who prays for it. It will be refused till the court are satisfied that the case before them is of a right about to be destroyed, irreparably injured, or great and lasting injury about to be done by an illegal act[.]

Bonaparte v. Camden & A.R. Co., 3 F. Cas. 821, 827 (C.C.D.N.J.1830)

To obtain injunctive relief, the movant must show (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest. Alejandro, 843 F.Supp. 2d at 1269 (citing Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir.2003); CBS Broadcasting, Inc. v. EchoStar Commun. Corp., 265 F.3d 1193, 1200 (11th Cir.2001); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir.1998)).

The Plaintiffs set forth in its Motion that six (6) of the counts in the Complaint allow for injunctive relief: (1) Count I - Unfair Competition by False Advertising; (2) Count II - Trademark Dilution; (3) Count III - Unlawful Interception and Disclosure of Electronic Communications; (4) Count IV - Theft of Trade Secrets (pursuant to Florida Statute §688.001, et seq.); (5) Count VII  - Intentional Interference with Contractual Relationships; and (6) Count VIII - Deceptive and Unfair Trade Practices (pursuant to Florida Statues §501.201, et seq.).[1]

---

[1] The Plaintiff lists six counts in the Motion on which it claims it can obtain injunctive relief, but then only addresses the elements on four of them.  The Plaintiff did not address whether it can prevail with respect to Count III -

The Plaintiff must clearly establish "the burden of persuasion" as to all four of the required elements under one of these counts.  Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir.1990).

### 3. PLAINTIFF CANNOT DEMONSTRATE THE REQUISITE IRREPARABLE INJURY

The Plaintiff's Motion lacks the showing of an irreparable harm.  "'The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" Id. (quoting Sampson v. Murray, 415 U.S. 61, 88, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974)).  "A showing of irreparable harm is 'the *sine qua* non of injunctive relief.'" Id. (quoting Frejlach v. Butler, 573 F.2d 1026, 1027 (8th Cir.1978)).  "The injury must be 'neither remote nor speculative, but actual and imminent'." Id. (quoting Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 973 (2d Cir.1989)).  An injury is "irreparable" only if it cannot be undone through monetary remedies. "The key word in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Id. (quoting Sampson, 415 U.S. at 90, 94 S.Ct. at 953).

The Plaintiff cannot establish irreparable harm under any of these counts; the Plaintiff can obtain adequate, alternative relief on any and all of the above referenced counts including monetary damages.  In fact, with respect to Count I, the Plaintiff's Motion plainly states "*Money damages have been shown* (Exhibit 9) and the mere fact that plaintiff's website is still not functioning is overwhelming evidence that it will continue to suffer losses."  (Pl.'s Mot. Prelim. Inj., p.15.)(italics added).  The Plaintiff cannot establish in its Motion or the complaint any injury

Unlawful Interception and Disclosure of Electronic Communications or Count VII - Intentional Interference with Contractual Relationships.

it could potentially suffer, which cannot be remedied monetarily if the Defendants are found to be liable under any or all of the counts as pled.  See e.g., <u>Pacific Aerospace & Electronics, Inc. v. Taylor</u>, 295 F.Supp.2d 1188 (E.D.Wash. 2003)(Only threats of disclosure or destruction of employer's trade secrets (future misconduct) constituted irreparable injury justifying preliminary injunctive relief preventing former employees and their new company from engaging in trade secret misappropriation, breach of employment agreements and common law duties, and unfair competition; preliminary injunctive relief was not warranted with respect to current active customers alleged to have been improperly obtained by defendants since any injury employer may have suffered or would suffer as a consequence could be remedied by awarding damages, and therefore irreparable injury requirement was lacking.)

4. <u>SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS</u>

The Plaintiff bears the burden of establishing it has "[a] substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success. <u>Schiavo ex rel. Schneider v. Schiavo</u>, 403 F.3d 1223, 1232 (11th Cir. 2005)(internal citation omitted).

a. <u>Count I - Unfair Competition by False Advertising</u>

The Plaintiff cannot meet the burden under this count as the Plaintiff has only provided unsubstantiated allegations of each of the elements constituting false advertisement.

> To succeed on a false advertising claim under § 43(a)(1)(B) of the Lanham Act, a plaintiff must establish that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been-or is likely to be-injured as a result of the false advertising.

<u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir.2004).  The Plaintiff cannot even claim it is likely that Section 43(a) of the Lanham Act applies in this situation.  The

Plaintiff cites <u>Dastar Corp. v. Twentieth Century Fox Film Corp.</u>, 539 U.S. 23 (2003) in its Motion (Pl.'s Mot. Prelim. Inj., p.14) for the proposition that this section of the Lanham Act extends "beyond trademark protection." <u>Id</u>.  However, the Supreme Court specifically held that the "§ 43(a) [of the Lanham Act] should not be stretched to cover matters that are of no consequence to purchasers."  <u>Dastar</u>, 539 U.S. at 32.    There are no purchasers.

In addition, the Supreme Court stated in <u>Dastar</u>,

Section 43(a) of the Lanham Act prohibits actions like trademark infringement that deceive consumers and impair a producer's goodwill. It forbids, for example, the Coca–Cola Company's passing off its product as Pepsi–Cola or reverse passing off Pepsi–Cola as its product... It could be argued, perhaps, that the reality of purchaser concern is different for what might be called a communicative product [such as a webpage]...

[A]ccording special treatment to communicative products is that it causes the Lanham Act to conflict with the law of copyright, which addresses that subject specifically. The right to copy, and to copy without attribution, once a copyright has expired, like "the right to make [an article whose patent has expired]—including the right to make it in precisely the shape it carried when patented—passes to the public." <u>Sears, Roebuck & Co. v. Stiffel Co.</u>, 376 U.S. 225, 230, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); see also <u>Kellogg Co. v. National Biscuit Co.</u>, 305 U.S. 111, 121–122, 59 S.Ct. 109, 83 L.Ed. 73 (1938). "In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." <u>TrafFix Devices, Inc. v. Marketing Displays, Inc.</u>, 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). The rights of a patentee or copyright holder are part of a "carefully crafted bargain," <u>Bonito Boats, Inc. v. Thunder Craft Boats, Inc.</u>, 489 U.S. 141, 150–151, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989), under which, once the patent or copyright monopoly has expired, the public may use the invention or work at will and without attribution. Thus, in construing the Lanham Act, we have been "careful to caution against misuse or over-extension" of trademark and related protections into areas traditionally occupied by patent or copyright. <u>TrafFix</u>, 532 U.S., at 29, 121 S.Ct. 1255. "The Lanham Act," we have said, "does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." <u>Id</u>., at 34, 121 S.Ct. 1255. Federal trademark law "has no necessary relation to invention or discovery," <u>In re Trade–Mark Cases</u>, 100 U.S. 82, 94, 25 L.Ed. 550 (1879), but rather, by preventing competitors from copying "a source-identifying mark," "reduce[s] the customer's costs of shopping and making purchasing decisions," and "helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product," <u>Qualitex Co. v. Jacobson Products Co.</u>, 514 U.S. 159, 163–164, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (internal quotation marks and citation omitted).

<u>Dastar</u>, 539 U.S. at 32-34.

The immediate matter is nothing more than generic websites where people enter to win prizes in exchange for subscribing.  No purchasing is necessary.  The Plaintiff's argument is also deficient in the fact that what they are complaining about is not "advertising" the webpages in this instance are the "product" or "service" of the Plaintiff and the Defendant.

   **b.  <u>Count II - Trademark Dilution</u>**

The Plaintiff, again, cannot meet the burden of establishing that it has a substantial likelihood of prevailing on the merits.

To establish a dilution claim, a plaintiff "must provide sufficient evidence that (1) the mark is famous; 2) the alleged infringer adopted the mark after the mark became famous; 3) the infringer diluted the mark; and 4) the defendant's use is commercial and in commerce."  <u>Brain Pharma, LLC v. Scalini</u>, 2012 WL 1563917, *6 (S.D.Fla. 2012).  To begin, the Plaintiff does not have a "mark".  The plaintiff has a registered domain name only.  This provision of the Lanham Act is inapplicable to the case at hand.

For purposes of §43(b) of the Lanham Act:

[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

   (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

   (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

   (iii) The extent of actual recognition of the mark.

   (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. §1125(b)(2)(A).  Using these criteria, the claim fails on its face: (1) The website launched in June, which means it had only been in existence for approximately two months; (2) the Plaintiff has no goods or services which they offer under "their mark," they attempt to get people to sign-up on their website for a chance to win a prize, while collecting their information once the individual signs up; (3) The Plaintiff has no "mark" to be recognized; (4) the Plaintiff has no mark registered under the Act of March 3, 1881, the Act of February 20, 1905 or on the principal register.  The Plaintiff has failed to show any ability to prevail under this count.

      **c.  <u>Count IV -Theft of Trade Secrets</u>**

Again the Plaintiff fails to meet the high burden of substantial likelihood of prevailing on this Count.

In order to prevail under claim for misappropriation of a "trade secret" the Plaintiff must establish that there is:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. 688.002(4).

The Plaintiff cannot establish the existence of a "trade secret." The alleged "database of subscribers" is readily ascertainable by proper means by other persons, and in fact is, as there are many online sweepstakes, which are run under the exact business model of the Plaintiff and Defendant.  Any person can register a domain name and set up a sweepstakes, which any person could generically search for and enter.  The Plaintiff may have had an argument under this statute if they had created a special algorithm that would in fact make their website the first

website to appear when a on-line search is conducted, but the plaintiff has not alleged such, and based on the allegations as set forth cannot maintain a cause of action for theft of a trade secret, let alone, argue that it has a substantial likelihood of prevailing. See, e.g., <u>VAS Aero Services, LLC v. Arroyo</u>, 2012 WL 1825275 (S.D.Fla. 2012); <u>Bestechnologies, Inc. v. Trident Environmental System, Inc.</u>, 681 So.2d 1175 (Fla. 2d DCA 1996); <u>Sun Crete of Florida, Inc. v. Sundeck Products, Inc.</u>, 452 So. 2d 973 (Fla. 4th DCA 1984).

### d.  <u>Count VIII - Deceptive and Unfair Trade Practice</u>

The Plaintiff cannot meet the high burden to obtain injunctive relief because the plaintiff does not have standing to proceed under this statute.  The Plaintiff is not an "aggrieved party" as stated in Fla. Stat. §501.211.  As stated above in paragraphs 4a and 4b, <u>supra</u>, the Defendants are not deceiving the public with their website for commercial gain.  There is no claim for false advertising or trademark dilution, as the pleadings as set forth by the Plaintiff do not allege any advertising has taken place by which "false advertising" could occur, the "false advertising" the Plaintiff alleges is the actual "product" of the Defendant itself.  Paragraph 4a., b., <u>Supra</u>.  The purpose of this statute is to protect "consumers" from being injured by "unfair" and "deceptive trade practices."  In this case a competitor is attempting to use this statute to obtain injunctive relief to enjoin competition.

### 5. <u>THERE IS NO THREATENED FUTURE HARM AND ISSUING A PRELIMINARY INJUNCTION WOULD BE ADVERSE TO THE PUBLIC INTEREST</u>

The Plaintiff's Motion, as previously stated, does not seek to prevent future harm.  The Plaintiff requested relief is for past acts, such as copying pages from CPL's websites (Pl.'s Mot. Prelim. Inj. p. 20), which would be a past act since the Plaintiff is alleging that the Defendants have already done this.  None of the requested relief is for an immediate future harm, but rather to remedy harms the Plaintiff alleges have already occurred.  Therefore, the Plaintiff is not

entitled to injunctive relief.  Furthermore, the entry of a preliminary injunction in this case would be adverse to the public interest of "competition" in business.  The Plaintiff has admitted that it had no agreements or contract with the Defendants; it has not registered any trademark, trade name, or created any proprietary system by which it can generate information that would be unavailable to the public at large.  The Plaintiff is simply trying to use the Court to gain oust a competitor through injunctive relief.  That is completely adverse to the public interest.

6.  **C**ONCLUSION

For the foregoing reasons the Defendants request that this Honorable Court deny the Plaintiff, CPL's Verified Motion for Temporary Restraining Order and Preliminary Injunction with Memorandum of Law, and grant any further and other relief this Court deems just and proper.

Dated September 17, 2012.

Respectfully submitted,

FURR AND COHEN, P.A.
Attorneys for Defendant
2255 Glades Road, Suite 337W
Boca Raton, Florida 33431
(561) 395-0500
(561) 338-7532 - facsimile

By: s/*Charles I. Cohen*
    Charles I. Cohen
    Florida Bar No: 224121
    E-mail: ccohen@furrcohen.com

EXHIBIT "A"

# Terms & Conditions

This Performance-Based Ad Network Agreement ("Agreement") is made by and between AD1 Media Group, LLC, a New York state limited liability company, with a principal place of business located at 106 East 19th Street, 8th Floor, New York, NY 10003 ("Company"), and the person, organization or entity named below ("Publisher,"), (each, a "Party," or together, the "Parties").

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants, premises, mutual promises and conditions set forth herein below, the Parties hereto agree as follows:

**1. Introduction.**

1.1. 1.1. The following Terms and Conditions of this Agreement ("Terms and Conditions") set forth the Parties' respective rights and obligations with respect to Publisher's relationship with Company, Publisher's participation in the Performance-Based Ad Network Program ("Program") and Publisher's use of the Network ("Network"), located on the Company Website ("Website").

1.2. Publisher hereby acknowledges and agrees to use the Network and participate in the Program only in accordance with the Terms and Conditions of this Agreement. **Company reserves the right, in its sole discretion, to make updates and/or changes (collectively, "Modification(s)") to the Website, Network, and/or to the Terms and Conditions at any time, without prior notification.** However, any payment Modifications will not retroactively apply to any compensation accrued prior to the applicable Modifications. The latest Terms and Conditions will be posted on the Website. Publisher's continued use of the Network after the posting of any Modifications thereof shall constitute Publisher's acknowledgement and agreement to such Modifications. Accordingly, Publisher should regularly check the Website for Modifications.

1.3. Publisher hereby acknowledges and agrees that Publisher is relying solely on this Agreement in making its decision to participate in the Program and is not relying on any representations, guarantees or statements other than as stated within this Agreement. **If Publisher does not agree to the Terms and Conditions of this Agreement in its entirety, Publisher is not authorized to: (i) register for or participate in the Program; and/or (ii) use or access the Network, in any manner or form whatsoever.**

**2. Rules of Interpretation.**
Unless a contrary intention is explicitly set forth herein, the following rules shall govern this Agreement.

2.1. <u>Headings</u>. Headings and sub-headings are simply used to ease the drafting process

and shall not be used in the interpretation of this Agreement.

2.2. <u>Currency</u>. Any references to payment and/or currency in this Agreement are in U.S. Dollars.

2.3. <u>Singular</u>. Any usage of the singular tense should be read to include the plural tense and vice versa.

2.4. <u>Sections</u>. Any references to sections, clauses or amendments shall be construed as pertaining exclusively to sections, clauses or amendments of this Agreement.

**3. The Program**.

3.1. <u>Approval</u>. In order to participate in the Program, Publisher must first obtain written confirmation of approval from Company. Conditioned upon Publisher's receipt of approval, Publisher's continued right to participate in the Program is conditioned upon ongoing compliance with this Agreement. **Publisher agrees that Company may in its sole discretion, refuse to grant approval and/or withdraw Publisher's approval at any time, for any reason.** Failure by Publisher, at any time, to observe the Terms and Conditions of this Agreement may in Company's sole discretion result in immediate withdrawal of Publisher's approval.

3.2. <u>Network</u>. The Network allows Company to post offers of advertising campaigns ("Campaigns") sponsored by Company and/or its third party affiliate advertising partners ("Advertisers"). Each Campaign will specify the amount of compensation and the terms under which Publisher will receive payment of compensation ("Commissions") when the applicable Campaign's requirements are fulfilled.

3.3. <u>Creative Content</u>. Company shall make available to Publisher the various creative marketing materials, text links, and/or banner advertisements (collectively, the "Creative Content") created by Company and/or Advertisers, associated with the applicable Campaign. All Creative Content will be posted on the Network for download, publication and distribution by Publisher subject to the Terms and Conditions of this Agreement. Upon grant of approval to participate in the Program, Publisher will be permitted to download all applicable Creative Content: (i) for publication on Publisher's website and/or any other website published with, owned, operated and/or controlled by Publisher ("Publisher Website(s)"); (ii) for distribution within Program-related commercial e-mail marketing messages ("E-mails") sent to those e-mail addresses listed in Publisher's database and/or any other database of e-mail addresses affiliated with, owned, operated and/or controlled by Publisher (collectively, the "Publisher Database"); and/or (iii) other Company pre-approved marketing channels. Company reserves the right in its sole discretion, to change or revise any Creative Content that is made available hereunder at any time. Accordingly, Publisher hereby acknowledges and agrees to use only the most recent version of Creative Content. Publisher may not alter, modify or otherwise change any Creative Content in any manner, whatsoever. Additionally, Publisher agrees that

Company may terminate Publisher's right to use any Creative Content in whole or in part, or Publisher's right to participate in any Campaign at any time, for any reason, whatsoever. Similarly, Publisher may in its discretion cease participation in any Campaign at any time.

3.4. <u>Compensable Actions</u>. Subject to any additional Campaign-specific terms that may apply, the Creative Content may be used by Publisher to generate valid sales, leads, applications, registrations, impressions, clicks, click-throughs or other compensable activities (collectively, "Compensable Actions"). Company is responsible for displaying and administrating all active Campaigns and tracking all associated Compensable Actions and Commissions.

3.5. <u>Action Tracking Codes</u>. Company may, from time-to-time, insert certain data mining tools within Creative Content which will enable Company to measure Publisher's performance and determine Publisher's Commissions ("Action Data"). These data mining tools include, but are not limited to, embedded tags, source codes, links, pixels and modules (collectively, "Action Tracking Codes"). Publisher agrees that each individual piece of Creative Content made available to Publisher in connection with any Campaign must include all such Action Tracking Codes, in an unaltered form. Additionally, Publisher agrees that it shall not knowingly, modify, circumvent, impair, disable or otherwise interfere with any Action Tracking Codes and/or other technology and/or methodology required or made available by Company to be used in connection with any Creative Content.

3.6. <u>Action Data</u>. Company may, from time-to-time, share Action Data with Publisher in order to help Publisher optimize the quality of leads generated from Publisher's activities or to otherwise improve the quality, functionality and/or mutual profitability of the Parties. Any Action Data that Company shares with Publisher will be compiled, calculated and posted on the Network. However, Publisher hereby acknowledges and agrees that all Action Data shall be the sole property of Company. Accordingly, Publisher further agrees that it may NOT share any such Action Data with any other third party or entity without the prior written authorization of Company. Finally, any questions or disputes regarding Action Data must be submitted in writing to Company within five (5) business days of the date that the subject Action Data is posted; otherwise, the information contained therein shall be deemed accurate and accepted by Publisher. Company shall investigate and use good faith to resolve any Action Data-related questions or disputes in its sole discretion.

**4. Client's Participation in the Program.**

4.1. <u>Registration</u>. In order to complete the registration process, Publisher must provide a "username" and "password". Publisher is responsible for safeguarding the confidentiality of the "username" and "password" and for any use or misuse of the Program and/or Network under the "username" and "password." Publisher agrees to immediately notify Company of any known or suspected unauthorized access to or use of the "username" and "password," or any other known or suspected breach of

security or misuse of the Network. By initialing at the bottom of this Agreement and completing the registration process, Publisher confirms that it: (i) has fully read this Agreement; (ii) understands all of the Terms and Conditions of this Agreement; and (iii) acknowledges and agrees to be fully bound by this Agreement.

4.2. <u>Lawful Use</u>. Publisher agrees to use the Network only for lawful purposes. Company reserves the right in its sole discretion, to monitor Publisher's use of the Network in order to ensure its lawful use. If Publisher or any other individual authorized by Publisher to use the Network on Publisher's behalf restricts or otherwise inhibits any other third party Publisher's lawful use of the Network, it shall constitute a material breach of this Agreement and shall be grounds for the immediate termination of this Agreement, without notice or opportunity to cure.

4.3. <u>Accuracy</u>. Publisher agrees to provide Company with true, accurate and complete information at all times, and to update this information as required to remain true, accurate and complete. Accordingly, any information provided by Publisher that is untrue, inaccurate, incomplete or not current, constitutes a material breach of this Agreement and shall be grounds for the immediate termination of this Agreement, without notice or opportunity to cure.

4.4. <u>Creative Content</u>. Publisher may only use the most updated Creative Content (including the subject and "friendly" from lines, the Advertiser legal disclosures and any other disclosures provided therein) that is posted on the Network. Publisher hereby acknowledges and agrees that it shall display the Creative Content exactly as it appears on the Network and will not alter it in any way. Failure by Publisher to adhere to this requirement, in addition to all other legal remedies available to Company, shall constitute a material breach of this Agreement and shall be grounds for the immediate termination of this Agreement, without notice or opportunity to cure result in termination of this Agreement. Notwithstanding the foregoing, Publisher must immediately comply with any and all requests by Company to modify, alter or otherwise change the positioning, placement, frequency and/or other editorial decisions related to Creative Content. Publisher must immediately remove Creative Content upon receiving notice from Company or upon the termination or expiration/cancellation of any applicable Campaign. Additionally, the use or attempted use of any marketing materials other than the Creative Content in connection with any applicable Campaign shall constitute a material breach of this Agreement and shall be grounds for the immediate termination of this Agreement, without notice or opportunity to cure result in termination of this Agreement.

4.5. <u>Client Database</u>. All E-mails disseminated by Publisher pursuant to this Agreement must be transmitted to e-mail addresses found within the Publisher Database. Any attempt to broker third party deals to deliver Creative Content without first obtaining Company's written authorization is strictly prohibited and, in addition to all other legal remedies available to Company, shall be grounds for the immediate termination of this Agreement, without notice or opportunity to cure result in termination of this Agreement. Publisher hereby acknowledges and agrees that at all times during the

term of the Agreement and for a period of at least three (3) years thereafter, it must maintain a complete and accurate accounting of all sign-up/registration data for every e-mail address found within its Publisher Database. Within twenty-four (24) hours of Company's request, Publisher shall provide at a minimum, all of the following data for any e-mail address to which it has disseminated Creative Content in connection with its participation in the Program: (i) e-mail address and IP address used to sign-up/register for the Publisher Database; (ii) date and time stamp of the sign-up/registration; (iii) source URL of sign-up/registration; and (iv) applicable Privacy Policy used in connection with valid sign-up/registration.

4.6.  Client Websites. All E-mails sent by Publisher pursuant to its participation in the Program must be disseminated from Company-approved Publisher Websites. Additionally, Publisher hereby acknowledges and agrees that all Publisher Websites must be fully functional at all levels; no "under construction" websites or sections shall be permitted.

4.7.  Complaints. In the event that either Party hereto receives a complaint from any Publisher Database e-mail end-user recipient ("Recipient") to whom Publisher disseminated Creative Content in connection with its participation in the Program, Publisher hereby acknowledges and agrees that it shall immediately provide Company with appropriate records verifying Recipient's valid sign-up/registration and authorization to receive E-mails from Publisher.

4.8.  Network Problems. Publisher hereby acknowledges and agrees that on occasion the Network may be inaccessible, unavailable or otherwise inoperable for any reason including but not limited to, the following: (i) equipment malfunctions; (ii) periodic maintenance procedures or repairs; and/or (iii) causes beyond Company's control or which are not reasonably foreseeable by Company including but not limited to, interruption or failure of telecommunication or digital transmission links, hostile network attacks, the unavailability, operation, or inaccessibility of websites or interfaces, network congestion or other failures. Company shall attempt to provide Publisher with access to the Network on a continuous basis. However, Publisher hereby acknowledges and agrees that Company has no control over the availability of the Network on a continuous or uninterrupted basis. Accordingly, the Terms and Conditions of this Agreement are subject to Company hardware, software, and bandwidth traffic limitations. And Company's failure to deliver because of technical difficulties does not represent a material breach and/or failure to meet its obligations under this Agreement.


**5. Marketing Restrictions.**

5.1.  Intellectual Property. Publisher hereby acknowledges and agrees that it may NOT use brand names and/or trademarks of another party (e.g., Apple® or Dell®) in either the "subject" or "from" lines or body of any commercial e-mail message. Publisher may not use third party trademarks in any other way to direct traffic to any Publisher Websites or Advertiser websites including but not limited to, purchasing

keywords from a search engine service provider that include the trademark, service mark and/or brand name, or any derivative of any such trademark, service mark or brand name, of any of the Advertisers, Company and/or any of their respective affiliates, publishers or Publishers.

5.2. <u>Deceptive Practices</u>. Publisher agrees that it may NOT utilize deceptive practices to generate leads such as "employment sites" that mislead consumers with the promise of employment for completing an offer. Publisher may not post Creative Content on public message boards, chat rooms or in public areas of social networking and job/employment sites including, but not limited to, MySpace.com, Facebook.com, Craigslist.org, etc. Publisher may not allow Creative Content to be placed on any non-Publisher Websites without the prior express written authorization of Company. Publisher may not include or promote any Campaign through any blogs, news articles or other social media without the prior written authorization of Company in each instance. Publisher must place or use the Creative Content only with the intention of delivering valid Compensable Actions. Publisher may not, nor knowingly permit any person to activate Creative Content or inflate the amount of Compensable Actions through any deceptive or misleading practice, method or technology including but not limited to, the use of any spyware, adware, device, program, robot, I-frames, hidden frames, redirects, spiders, computer script or other automated, artificial or fraudulent methods designed to appear like an individual, real live person performing a Compensable Action.

5.3. <u>Incentives</u>. Publisher agrees that it may NOT: (i) use incentivized offers, create the appearance of incentivized offers, establish or cause to be established any promotion that provides any incentives, sweepstakes entries, rewards, points or other compensation to be earned in connection with generating Compensable Actions, or otherwise attempt to induce Internet users to click on any Creative Content or perform any action through the use of any other incentives, without obtaining Company's prior written authorization; and/or (ii) place any statement in close proximity to Creative Content requesting that e-mail Recipients or Internet users "click" on the Creative Content (e.g., "Please click here").

5.4. <u>Additional Restrictions</u>. Publisher agrees that it may NOT: (i) place misleading statements in close proximity to any Creative Content; (ii) take control of a user's computer by delivering advertisements that a user of a computer cannot close without turning off the computer or closing all sessions of the Internet browser for the computer; (iii) install or execute on another's computer one or more additional software program(s) without authorization of that individual (in addition, Publisher must clearly provide instructions to disable the software, such that the software is easily identifiable and the removal can be performed without undue effort or knowledge by the user of the computer); (iv) distribute spyware or other similar harmful software; and/or (vi) redirect traffic to a website other than the website listed by the particular Advertiser. Additionally, spawning process pop-ups are strictly prohibited.

**6. Sub-Publishers.** For purposes of this Agreement, any business partners or associates of Publisher that participate in or perform any activities for Publisher as a part of the Program shall be deemed to be "Sub-Publishers." **Publisher hereby acknowledges and agrees that any and all Sub-Publishers must be pre-approved by Company.** Company reserves the right to withhold or refuse approval of any Sub-Publisher for any reason whatsoever, and Company may revoke its approval of any Sub-Publisher at any time for any reason whatsoever. All Sub-Publishers must meet the same criteria for approval as Publisher and must comply with the Terms and Conditions of this Agreement. Additionally, Publisher agrees that Publisher is fully responsible for the acts and/or omissions of its Sub-Publishers and is jointly and severally liable with such Sub-Publishers. Accordingly, Company may revoke Publisher's approval to participate in any Campaign based upon the acts or omissions of Publisher's Sub-Publishers. Company reserves the right to use all legal measures available and necessary in order to ensure that Publisher and its Sub-Publishers are in compliance with this Agreement. Publisher agrees that it shall fully and unconditionally indemnify Company for any and all actions of its Sub-Publishers including, but not limited to, payment of legal fees and costs if necessary.

**7. Grant of Rights.**

7.1. <u>License</u>. Subject to the Terms and Conditions of this Agreement, Company grants to Publisher a non-transferable, non-assignable, non-sublicensable, revocable, non-exclusive, limited license, to participate in the Program and use the Network (including any Creative Content posted thereon). Publisher shall not acquire any rights, title or interest in the Network, Creative Content or any other information provided as part of this Agreement. Additionally, all rights not expressly granted hereunder are expressly reserved to Company.

7.2. <u>Restrictions</u>. Publisher shall not attempt in any way to alter, modify, eliminate, conceal, or otherwise render inoperable or ineffective the Network or Action Tracking Codes.

7.3. <u>Publisher Network</u>. In the event that Publisher also maintains its own network of publishers, Publisher may NOT provide the Program or any Campaign or Creative Content to its publishers, without the prior written authorization of Company. If Publisher fails to adhere to the foregoing, in addition to any other legal remedies available to Company, Publisher shall forfeit its rights to any otherwise unpaid Commissions owed by Company under this Agreement.

7.4. <u>Marks</u>. All Company and Publisher trademarks, trade names, service marks, and logos, whether or not registered (collectively, the "Marks"), shall be the sole and exclusive property of the respective owning party, which shall own all right, title and interest therein.

7.5. <u>Ownership</u>. Publisher agrees that the Network is Company's property and is protected by U.S. and international copyright, trademarks, patents and other proprietary rights and laws relating to Intellectual Property. Additionally, all non-public information, data and reports received from Company herein or as part of the Program is proprietary to and owned by Company.

7.6. <u>Data Protection</u>. Company shall secure Publisher's data with commercially reasonable care and shall use relevant industry best practices to do so. However, Company cannot be held responsible for any losses beyond its control. Data remains the property of Publisher and shall not be accessed for any purpose other than Publisher's use of the Network as set forth herein.

7.7. <u>Data Collection</u>. Publisher authorizes Company to collect, store and process Publisher data subject to the Terms and Conditions of this Agreement and Company's Privacy Policy (located at http://ad1mg.com/PrivacyPolicy.aspx).

7.8. <u>Data Access</u>. Publisher may only access the Network in a manner approved by Company. Company shall not sell, license, share, transfer or otherwise disclose any Publisher data to any third party except as otherwise specifically provided under this Agreement or as required by law or court order. However, Company may access the Publisher Database in order to unsubscribe any Recipients who sent Company a request to do so, or if the presence of such e-mail address otherwise violates this Agreement.

**8. Payment.**

8.1. <u>Commissions</u>. Company shall pay Commissions approximately thirty (30) days after the last day of each calendar month. Publisher agrees that Company shall pay Commissions to Publisher for the amount earned by Publisher during the previous month, less any taxes required to be withheld under applicable law, provided that Company in its sole discretion may withhold Commissions until such time as the Advertiser has paid Company for any applicable Campaign. All determinations made by Company in connection with the Action Tracking Codes, Compensable Actions, full and proper payment from Advertisers and any associated Commission payments due to Publisher shall be final and binding on Publisher.

8.2. <u>Minimum Payment Threshold</u>. Payments of Commissions shall be made to Publisher provided that Publisher has accumulated at least Twenty-Five Dollars ($25.00) ("Minimum Payment Threshold") in accrued revenues during the calendar month. Additionally, Publisher agrees that if at any time during the term of this Agreement Publisher has not accumulated the Minimum Payment Threshold, then the amount due to Publisher will continue to roll over to the next month until an amount equal to or greater than the Minimum Payment Threshold has been accrued.

8.3. <u>Effect of Expiration or Termination</u>. Upon expiration or termination of this Agreement, all legitimate funds due and owing to Publisher (not disputed in good faith by Company), including any amounts below the Minimum Payment Threshold, shall be paid during the next billing cycle. However, Company, in its sole discretion, may withhold any and all payments due and owing to Publisher until such time as the applicable Advertiser has paid Company pursuant to the associated Campaign. Additionally, Company reserves the right to reduce any and all payments owed to Publisher where the applicable Advertiser has offset corresponding payments owed

to Company. Notwithstanding the foregoing, Company's obligations under this Agreement do not involve or include investigating or resolving any claim or dispute involving Publisher and any Advertiser or other third party.

8.4. <u>Impairment</u>. If, due to any impairment of the Action Tracking Codes or any other reason, Company is unable or fails to provide Publisher with accurate and/or complete Action Data, Publisher hereby acknowledges and agrees that Company shall calculate Compensable Actions (the "Projected Compensable Actions"), based upon: (i) Publisher's average monthly Compensable Actions previously recorded by Company for the applicable Campaign, pro-rated for any shorter or longer period of time, where data is available to calculate a monthly average; or (ii) such amount that Company, in good faith, reasonably determines is due and owing, in its sole discretion, where data needed to calculate Publisher's average monthly Compensable Actions is unavailable.

8.5. <u>Condition Precedent</u>. Publisher hereby acknowledges and agrees that Company may, in its sole discretion, require Publisher to provide a W-9, or similar tax identification information, as a condition precedent to receiving any Commission payments.

8.6. <u>Limitations</u>. Notwithstanding the foregoing, Company shall not be responsible to make payment of Commissions to Publisher where: (i) the applicable Compensable Action involves the generation of leads, and the applicable leads delivered by Publisher are comprised of Recipients that have previously registered for, opted-in to and/or are already a member and/or a customer of the applicable Advertiser; (ii) the leads are generated using fraud, incentivized marketing or are otherwise in violation of any of the Terms and Conditions of this Agreement; and/or (iii) the subject Recipient did not opt-in to receiving E-mails from Publisher. Company shall not pay Commissions to Publisher on any billings: (a) that occur before Publisher is approved to participate in the Program; and/or (b) that occur after expiration or termination of either the applicable Campaign or this Agreement.

8.7. <u>Taxes</u>. Publisher is responsible for paying any and all applicable taxes (if any) due to all taxing authorities arising from, or in connection with its participation in the Program. Without limiting the foregoing, Publisher agrees that it is fully responsible for any and all taxes, whether state or local, and related fees, costs and/or penalties incurred by Company and/or any of its Advertisers pursuant to Chapter 57 of the Laws of 2008 amending the New York State Tax Law.

8.8. <u>Breach</u>. In addition to any other remedies that may be available at law or in equity, Company reserves the right to withhold and/or cancel Commission payments due and owing to Publisher at any time, in its sole discretion, when Company believes in good faith that Publisher is in breach of any of the Terms and Conditions of this Agreement.

**9. Suppression Lists.**

Company agrees that it will make available to Publisher a list of any and all e-mail addresses and/or domains associated with unsubscribe (opt-out) requests ("Suppression List") that it receives. With respect to any Suppression List generated in connection with Publisher's participation in the Program, Publisher hereby acknowledges and agrees to: (i) download Suppression Lists from the "Suppression Data" area of the Website not less than every seven (7) days; (ii) use any such Suppression List, and the individual Recipient's records, solely for the suppression purposes set forth herein, even after expiration or termination of this Agreement; (iii) use any such Suppression Lists to remove all e-mail addresses and/or domains contained therein from future E-mail dissemination; (iv) not use any such Suppression Lists for purposes of e-mail marketing (or provide the Suppression List to any third party for said purposes) and not send, or cause to be sent, any E-mails to any e-mail address and/or domain appearing on any such Suppression List; (v) not use any such Suppression Lists for purposes of e-mail appending in any manner whatsoever; (vi) hold any such Suppression List in trust and confidence and use the same solely for the suppression purposes set forth herein; (vii) not retain a copy of any such Suppression List following the expiration or termination of this Agreement; and (viii) not disclose any such Suppression List to any employee, consultant, Sub-Publisher, sub-contractor or third party individual, corporation or entity without first ensuring said party's written agreement to be bound by this Agreement. Such agreement shall be immediately forwarded to Company, upon request. Company reserves the right to withhold its authorization to such disclosure and may within its sole discretion, accordingly bar the disclosure of any such Suppression List. All Suppression Lists provided by Company are deemed to be Confidential Information of Company, as defined herein. Publisher agrees that Suppression Lists may NOT be used by Publisher for any purpose other than to comply with applicable laws regulating e-mail marketing. Publisher further agrees that: (a) it has downloaded and removed the domains located on the Federal Communications Commission's ("FCC's") wireless domain names list (http://www.fcc.gov/cgb/policy/DomainNameDownload.html) from any and all current data used in connection with its participation in the Program; and (b) any and all new data that it acquires, regardless of its source, will be scrubbed against the FCC's wireless domain names list and that the domain names contained therein will be removed before disseminating any E-mails in connection with its participation in the Program. Finally, Publisher agrees to maintain tangible records evidencing the removal of any e-mail addresses from all applicable Suppression Lists for verification by Company upon request.

**10. Fraud.**

10.1. <u>Monitoring</u>. Company actively monitors the Network and all Program-related activities for potential fraud. If, at any time, Company in good faith suspects or detects fraud, Company reserves the right in its sole discretion to immediately terminate Publisher's approval to participate in the Program pending further investigation. **Publisher hereby acknowledges and agrees that Company, in its sole discretion, shall be responsible for determining the existence of fraud. Furthermore, Publisher acknowledges and agrees to be bound by any and all such determinations.**

10.2. <u>Consequences</u>. Upon a good faith determination of fraud by Company, Publisher agrees that Publisher bears the burden of proving to Company that Publisher did not engage in fraud. If Publisher fraudulently adds leads or clicks or inflates leads or clicks by fraudulent traffic generation (such as pre-population of forms or mechanisms not approved by Company or use of websites in co-registration campaigns that have not been approved by Advertiser), as determined solely by Company, then Publisher shall forfeit its entire Commission for all Campaigns and it shall constitute a material breach of this Agreement and shall be grounds for the immediate termination of this Agreement, without notice or opportunity to cure. If Publisher is notified that fraudulent activities may be occurring and Publisher fails to take prompt action to stop the fraudulent activities, then in addition to any other remedies available to Company, Publisher shall be responsible for all costs and legal fees arising from these fraudulent activities. Additionally, in the event that Publisher has already received Commission payment(s) based upon fraudulent activities, Company reserves the right to seek credit or remedy from future earnings or to demand reimbursement from Publisher.

**11. Term & Termination.**

11.1. <u>Term of Agreement</u>. The term of this Agreement shall begin on Publisher's receipt of written confirmation of approval by Company and shall remain in effect until terminated as set forth herein.

11.2. <u>Termination</u>. This Agreement may be terminated by either Party, at any time, with or without cause, by giving the other Party written notice ("Notice of Termination").

11.3. <u>Effective Notice of Termination</u>. Both Parties agree that Notice of Termination must be furnished in writing to be effective. Notice of Termination may be sent via email. Notice of Termination shall be effective upon receipt ("Effective Date of Termination").

11.4 <u>Effect of Termination.</u>

11.4.1. It is understood that Publisher is only eligible to earn Commissions on Compensable Actions generated during the term of this Agreement. Accordingly, upon effective Notice of Termination, any and all licenses granted herein shall immediately terminate. Termination shall not affect either Party's payment obligations to the other in connection with this Agreement. In the event of termination, all amounts due and owing under this Agreement through the Effective Date of Termination shall become due and payable.

11.4.2. Upon termination of this Agreement for any reason, both Parties shall immediately cease performance of its obligations as set forth herein. In particular, Publisher agrees to: (i) immediately cease to use and remove from all Publisher

Websites, all Creative Content made available to Publisher in connection with its participation in the Program; and (ii) immediately cease disseminating any and all E-mails in connection with any Campaigns. Additionally, any and all licenses and rights granted by Company to Publisher in connection with this Agreement shall immediately cease and terminate. Furthermore, any and all Confidential Information, Creative Content and/or Proprietary Information of Company (including, as applicable, any confidential or proprietary information of any Advertiser) that is in Publisher's possession or control must be immediately returned to Company or destroyed upon request. Publisher shall provide written confirmation of destruction executed by an officer, upon request, within five (5) business days.

11.4.3. All terms of this Agreement which are expressly or by their nature impliedly intended to survive the expiration or termination of this Agreement shall not be affected by such expiration or termination. In particular, the rights and obligations of the Parties pertaining to Confidentiality, Indemnification, Representations and Warranties, Limitations of Liability and Dispute Resolution shall survive the termination or expiration of this Agreement. All other rights granted herein shall cease upon termination or expiration of this Agreement. Notwithstanding the foregoing, all termination rights are in addition to and without prejudice to any other rights that either Party may have under this Agreement, at law, or in equity.

**12. Acceptable Use Policy.**

12.1. General. This Acceptable Use Policy ("AUP") sets forth the approved and prohibited uses of the Network and in connection with Publisher's participation in the Program. Company reserves the right to modify the AUP at any time, effective upon posting to the Network. By registering for the Program and/or using the Network, Publisher hereby acknowledges and agrees to comply with the AUP as modified from time-to-time. Any violation of this AUP may result in disciplinary action up to and including the termination of this Agreement and any other available legal remedies.

12.2. SPAM. For the purposes of this Agreement, the term "SPAM" is used to describe unsolicited or unauthorized commercial e-mail messages. These messages are often referred to as junk, bulk or unsolicited commercial e-mail. Pursuant to U.S. Federal law, SPAM means "[any e-mail] message the primary purpose of which is the commercial advertisement or promotion of a commercial product or service." An e-mail message will be considered unsolicited if it is not one hundred percent (100%) opt-in by all Recipients. E-mails will be considered SPAM if it contains any deceptive or unsubstantiated claims regarding products or services and/or consists of any unfair business practices.

12.3. NO SPAM Policy. Company is committed to the highest standards of privacy and takes proactive measures to maintain a strict NO SPAM policy. Accordingly, Company requires that Publisher practice permission-based e-mail marketing

techniques and does not participate in nor condone the sending of SPAM or work with any third parties who do so. Company shall thoroughly investigate any allegations or SPAM complaints made by Recipients in connection with the Program. Moreover, Company shall determine in its sole discretion whether Publisher has used any Creative Content to disseminate SPAM and reserves the right to immediately terminate this Agreement if Publisher is found to be using any Creative Content in order to disseminate SPAM.

12.4 <u>Permission-based Guidelines</u>.

12.4.1. <u>General</u>. Publisher agrees that (i) all e-mail addresses to which Publisher disseminates E-mails were collected from Publisher Websites and in compliance with the applicable websites' Company-approved privacy policies, and such Privacy Policies specifically allow for: (a) Publisher to transfer such data to third party business partners for marketing purposes; and (b) Publisher to use the data as contemplated herein; (ii) the data was/will be obtained, collected and compiled without employing deceptive or illegal practices; (iii) Recipients have consented to receiving E-mails from Publisher, and such consent includes the right to transfer the data to third party business partners for the use contemplated by this Agreement; and (iv) the data was obtained using methods that fully comply with all applicable state and federal laws, rules and Federal Trade Commission implementing regulations (including, but not limited to, the CAN-SPAM Act of 2003, as amended ("CAN-SPAM"), the Gramm-Leach Bliley Act, the Fair Credit Reporting Act, the Federal Trade Commission Act, the Fair Debt Collection Practices Act, the Federal Communications Act, and all rules and regulations promulgated under any of the foregoing, as well as all applicable state laws including, without limitation, the California Financial Privacy Act and the Vermont Consumer Protection Act, and all rules and regulations promulgated under such state laws), international laws, rules and regulations, as well as IAS network, domain and e-mail service provider guidelines, with respect to the Program (collectively, "Laws and Regulations"). Company reserves the right to terminate this Agreement if Publisher cannot prove that every Recipient provided the requisite permission. Accordingly, Publisher shall maintain records evidencing such permission including, but not limited to: (i) applicable IP addresses; (ii) time/date stamps; and (iii) source URL.

12.4.2. <u>Recipient's Permission</u>. Publisher agrees that before adding a new e-mail address to its Publisher Database, it must first have received the Recipient's Permission. For the purposes of this Agreement, "Permission" means that the Recipient provided Publisher with the e-mail address for the explicit purpose of receiving E-mails. Moreover, Publisher agrees that Company may later require Publisher to use unselected ("unchecked") check-boxes at the point at which the Recipient's Permission is obtained. In so doing, Publisher agrees that such a change would then become a condition precedent to obtaining Permission as set forth under this Agreement.

12.4.3. <u>Requirements</u>. Publisher must successfully remove the e-mail address of every recipient who requests to be unsubscribed within five (5) days of the Recipient's initial unsubscribe request. Please be advised that in addition to Company's request that Publisher respond to all unsubscribe requests with courtesy, Publisher is required to retain a copy of all unsubscribe requests that it receives and must furnish them to Company upon request. Finally, every e-mail message sent pursuant to this Agreement must: (a) be Confirmed Opt-in; (b) be Authenticated; (c) include a single-click unsubscribe link; (d) include the name and physical address of the sender; and (e) adhere to the Hard Bounce Rule (as defined below).

12.4.3.1. <u>Confirmed Opt-in</u>. For the purposes of this Agreement, the term "Confirmed Opt-In" means that after a Recipient requests to become a subscriber and receive E-mails, that Recipient shall receive a confirmation that must be responded to in order to validate the subscription. Publisher agrees that it must have used a "Confirmed Opt-in" subscription method for all Recipients.  Any attempt by Publisher to disseminate E-mails to a Recipient whose e-mail address was not obtained via the Confirmed Opt-in process is strictly prohibited.

12.4.3.2. <u>Authenticated</u>. For the purposes of this Agreement, the term "Authenticated" means that Publisher must be able to provide Company with the source of each Recipient's e-mail address and the method used to sign up. This includes, but is not limited to, date and time of sign up, IP address of sign up, and the website of sign up. Publisher must be able to authenticate every Recipient to whom it has disseminated E-mails.

12.4.3.3. <u>Single-click Unsubscribe</u>. Publisher agrees that every E-mail disseminated in connection with its participation in the Program must contain a functional, single-click unsubscribe link that enables the Recipients to instantly be removed from the Publisher Database without having to provide access data (e.g., Login and/or Password). Each unsubscribe link must remain fully functional for a period of not less than thirty (30) days after the date on which Publisher disseminated the applicable e-mail message. Publisher agrees that it will not disable, remove or attempt to disable or remove any unsubscribe link.

12.4.3.4. <u>Hard Bounce Rule</u>. Publisher agrees that it must remove any e-mail addresses from its Publisher Database at the latest, following the third notification that the applicable addresses have been Hard Bounced. For the purposes of this Agreement, the term "Hard Bounced" means the return of an E-mail disseminated to an e-mail address as a result of being permanently undeliverable or because the address does not exist.

12.4.4. <u>Co-registration</u>. For the purposes of this Agreement, the term "Co-registration" means an arrangement between third party business partners to collect Recipient information. In order to successfully obtain Permission through Co-registration on

a third party business partner's website, Publisher agrees that at the time Permission was obtained, there must have been separate, distinct and unchecked opt-in check-boxes for each e-mail list such that the Recipient sufficiently understood that it was providing Permission to receive third party e-mail marketing messages.

11.4.5. <u>Limitations</u>. Please be advised that even when proper Permission is granted, it doesn't last forever. Accordingly, Publisher hereby acknowledges and agrees that Permission shall automatically expire on the second anniversary of the date on which Permission was first obtained. Therefore, Publisher must obtain new and fresh Permission (at a minimum) every two (2) years from each Recipient within the Publisher Database in order to comply with this AUP.

12.5 <u>Prohibited Uses</u>.
Without prejudice to the prohibitions set forth above, the following is a non-exclusive list of additional uses that are prohibited when participating in the Program:

12.5.1. <u>Sources</u>. Publisher is prohibited from sending E-mails to any e-mail addresses obtained by means of harvesting, dictionary attack (the practice of sending e-mail to addresses made up of random combinations of letters and/or numbers into multiple permutations in the hope of reaching valid e-mail addresses), or purchased, rented, borrowed or otherwise acquired from a third party (whether or not the third party obtained the Recipient's consent).

12.5.2. <u>Distribution Lists</u>. Publisher is prohibited from sending E-mails to any Distribution List. For the purposes of this Agreement, the term "Distribution List" means any e-mail address that forwards to more than one individual at a time. Please be advised that this includes generic e-mail addresses including but not limited to business@domain.com, support@domain.com, sales@domain.com, info@domain.com, postmaster@domain.com, and webmaster@domain.com, as it is impossible to determine whether or not the requisite permission was obtained.

12.5.3. <u>Deceptive Practices</u>. Publisher is prohibited from sending E-mails that employ Deceptive Practices. For the purposes of this Agreement, the term "Deceptive Practices" includes: (i) falsifying or obscuring components of an e-mail message header, including the "From" line and the routing information ("received" lines), in order to conceal their identity; (ii) using vague, misleading or deceptive subject lines, in order to induce Recipients to open E-mails; (iii) assuming a fake identity, in order to communicate with recipients, (iv) impersonating any person, including but not limited to, an official of Company or an information provider; (v) using Company's bandwidth for anything other than e-mail marketing; or (vi) failing to identify the E-mails as an advertisement.

12.5.4. <u>Permission</u>. Publisher is prohibited from sending E-mails: (i) that use a third party's Internet domain name without permission of the third party, or otherwise misrepresent any information identifying the point of origin or the transmission

path; (ii) that are unrelated to the purpose(s) for which the Recipient's Permission was initially intended; (iii) through a computer or network without prior written authorization; or (iv) from an outside host.

12.5.5. <u>Mass Mailing</u>. Publisher is prohibited from using the Program for any type of one-time mass mailing scheme to any Recipients who did not Opt-in.

12.5.6. <u>Cookie Re-Spawning</u>. Publisher is prohibited from sending E-mails that utilize Cookie Re-Spawning. For the purposes of this Agreement, the term "Cookie re-spawning" means the use of a Flash storage devise to back up browser cookies and restore them after recipients delete them; or otherwise utilize Flash storage as a form of consumer tracking without the privacy notices and controls that typically accompany the use of browser cookies.

12.5.7. <u>User Agent</u>. Publisher is prohibited from sending E-mails that utilize User Agents. For the purposes of this Agreement, the term "User Agent" means a little bit of code that tells a website which operating system and web browser a computer is using, which is often used as a means of tallying information about visitors to the website.

12.5.8. <u>Blocklists</u>. Publisher is prohibited from knowingly sending E-mails to any Recipients featured on industry Blocklists. For the purposes of this Agreement, the term "Blocklist" means any IP or URL-based listing of e-mail addresses to which marketers should never disseminate or attempt to disseminate campaigns. The following is a non-exclusive list of blocklists: (i) Barracuda; (ii) Brightmail; (iii) CBL; (iv) NJABL; (v) Spamcop; and (vi) Spamhaus.

12.5.9. <u>Blacklists</u>. For the purposes of this Agreement, the term "Blacklist" means any and all lists of individuals or entities identified as disseminators of SPAM. If, at any time, Company is implicated on an industry Blacklist, then Publisher shall have no more than ninety-six (96) hours from the Receipt of Blacklist notification in order to remedy the situation. If, after the expiration of the allotted ninety-six (96) hours, Publisher has been unable or unwilling to obtain satisfactory resolution, then Company may terminate this Agreement. Furthermore, Company, in its sole discretion, may determine what constitutes satisfactory resolution.

12.6 <u>Prohibited Content</u>.

Publisher is prohibited from disseminating E-mails that include or display any content that contains, promotes, references or links to: (i) material that exploits children or otherwise exploits any individuals under eighteen (18) years of age; (ii) material that is grossly offensive, including blatant expressions of discrimination, bigotry, prejudice, racism, sexism, ageism, gender-bias, hatred or excessive profanity or that is abusive, invasive, lewd, lascivious, libelous, defamatory, vulgar, obscene, harassing, threatening or otherwise unlawful or threatening against an individual or group; (iii) false, misleading, illegal or deceptive activity; (iv) pornographic, sexually explicit or

otherwise adult-oriented content, including but not limited to magazines, video and software, or escort services; (v) political, religious or charitable organizations, issues or causes; (vi) firearms, weaponry, ammunition, fireworks, explosives hazardous materials, hazardous substances or instructions on how to assemble or otherwise make bombs, grenades or other weapons; (vii) odds making and betting/gambling services, including but not limited to poker, casino games, horse and dog racing and college and pro sporting events; (viii) tobacco and tobacco-related products, alcoholic beverages, illegal drugs or drug paraphernalia; (ix) infringements or misappropriations of the intellectual property rights of any third party; (x) material that introduces viruses, worms, harmful code and/or Trojan horses on the Internet; (xi) material that is unsolicited or unauthorized, including advertising, solicitations, promotional materials, junk mail, spam, chain letters, pyramid schemes or ponzi schemes; or (xii) content otherwise deemed unsuitable or detrimental to the reputation of Company or its other Publishers.

12.7 <u>Enforcement</u>.

12.7.1. <u>Compliance Measures</u>. Company reserves the right to monitor Publisher's activities to ensure strict compliance with this AUP. Additionally, Company reserves the right to undertake any of the following measures to ensure AUP compliance: (i) review the list source, list age and collection methods of all Publisher Databases; or (ii) require that Publisher check a box with the following statement before accessing any Creative Content from the Network: "I hereby acknowledge and agree that all Recipients granted their permission to be sent this Creative Content."

12.7.2. <u>SPAM Complaints</u>. Publisher agrees that it is responsible for ensuring that its E-mails do not generate a number of SPAM complaints in excess of industry norms. Company shall determine in its sole discretion whether Publisher's number of SPAM complaints is within industry norms. Publisher agrees that Company's determination shall be final, binding and conclusive for all purposes under this Agreement. If Company determines that Publisher's number of SPAM complaints are in excess of industry norms, Company reserves the right to immediately terminate this Agreement.

12.7.3. <u>Additional Remedies</u>. If Company determines in its sole discretion that Publisher has violated or attempted to violate the AUP, Company reserves the right to pursue the following non-exclusive list of remedies: (a) Company may bring an action in any court of competent jurisdiction to enjoin such activity, it being understood that such activity may cause irreparable harm to Company which may not be fully compensable by monetary damages; and (b) Company may recover from Publisher monetary losses caused to Company by such activity in an amount equal to the Company's actual monetary loss, including but not limited to any damage, loss or expense (including attorney's fees) resulting from any third party claim made against Company as a result of

Publisher's conduct in violation of this provision. Additionally, Publisher shall be responsible for reasonable costs incurred by Company in bringing such actions, including its reasonable attorney's fees.

12.8 <u>Non-Waiver</u>.

Failure by Company to enforce any portion of this AUP in every instance does not in any way amount to a waiver of its rights.

---

For more information on CAN-SPAM, please visit the Federal Trade Commission's website, located at:
http://www.ftc.gov/bcp/edu/pubs/business/ecommerce/bus61.shtm.

---

**13. Representations and Warranties.**

Publisher hereby represents and warrants that: (i) this Agreement has been duly and validly executed and delivered by Publisher and constitutes Publisher's legal, valid and binding obligation which is fully enforceable against it in accordance with its terms; (ii) Publisher is duly licensed, authorized and certified by all applicable governmental and regulatory authorities to perform all of Publisher's rights and duties pursuant to this Agreement; (iii) Publisher will only disseminate E-mails to those Recipients that have given Permission, and have not revoked such Permission as of the date that the E-mail was disseminated to such Recipient; (iv) Publisher will comply with all applicable Laws and Regulations; and (v) Company will enter into similar agreements with other potential Publishers in direct competition with Publisher. Publisher shall be solely responsible for the development, operation and maintenance of Publisher Websites, Publisher Database and for any and all materials that appear throughout Publisher Websites. Such responsibilities include, without limitation: (a) the technical operation of Publisher Websites and all related equipment; (b) creating and posting Creative Content, descriptions and references on Publisher Websites; (c) the accuracy and propriety of materials posted on Publisher Websites; (d) ensuring that materials posted on Publisher Websites do not violate or infringe upon the rights of any third party and are not defamatory, obscene, libelous, harmful, illegal or otherwise offensive; (e) ensuring that Publisher Websites comply with all applicable laws, rules and regulations; (f) ensuring that its use of Publisher Database will comply with all applicable privacy, data protection, credit and any other laws, statutes and governmental regulations including, without limitation, CAN-SPAM, state e-mail, deceptive marketing and privacy laws, the Fair Credit Reporting Act and the Children's Online Privacy Protection Act; (g) ensuring compliance by any Sub-Publishers with the Terms and Conditions of this Agreement; (h) ensuring that Publisher Website shall, at all times during the term of this Agreement, maintain a privacy policy ("Publisher Privacy Policy") that complies with all applicable laws; (i) that the Publisher Privacy Policy shall explain that Publisher Websites allows third parties, including Advertisers, to disseminate the Creative Content; and (j) that the Publisher Privacy Policy explains that Publisher Websites are allowed to share any information collected therein with third parties, as contemplated hereunder.

**14. Confidentiality.**

14.1 <u>Confidential Information</u>. "Confidential Information" means any non-public information of the other Party ("Disclosing Party") that is designated as confidential, or that the recipient ("Receiving Party") knew or reasonably should have known was confidential because it derives independent value from not being generally known to the public. Without limiting the generality of the foregoing, the Terms and Conditions of this Agreement shall be considered Company's and Publisher's Confidential Information. Confidential Information shall not include any information which: (i) a Party can demonstrate was rightfully in its possession prior to the date of disclosure to it by the other Party; (ii) at the time of disclosure or later, is published or becomes part of the public domain through no intentional or inadvertent act, failure to act, or breach on the part of a Party; (iii) a Party has developed independently without reference to any Confidential Information of the other Party; or (iv) a Party can demonstrate came into its possession from a third party subject to no restriction of confidentiality and who had a bona fide right to make such information available. For the purposes of this Agreement, the term "becomes part of the public domain" shall mean readily accessible to the public in a written or other publication, and shall not include information which was only available by a substantial searching of the published literature or information the substance of which must have been pieced together from a number of publications and sources. Both Parties agree that the Receiving Party shall have the burden of proving the applicability of any of the foregoing exceptions.

14.2 <u>Duty to Maintain Confidentiality</u>. Each Party shall maintain and protect all of the Confidential Information of the other Party as confidential and secret. The Receiving Party shall not disclose nor cause the disclosure of any of the Confidential Information of the Disclosing Party to any third person or entity for any purpose at any time and shall undertake all steps reasonably necessary to prevent such disclosure. The Receiving Party shall be entitled solely to disclose such Confidential Information to those employees and consultants of such Party who have a specific need to use such information in connection with the purposes of this Agreement. All employees and consultants to whom the Receiving Party discloses any Confidential Information of the Disclosing Party shall be advised of the existence and scope of this Agreement and shall be bound either by the Terms and Conditions of this Agreement or by legally binding nondisclosure restrictions for the benefit of the Disclosing Party which must be at least as restrictive as this Agreement.

14.3 <u>No Other Use</u>. No Party shall be permitted to use the Confidential Information of the other Party other than as set forth herein and required for the performance of its obligations under this Agreement. Accordingly, no Party shall be permitted to use the Confidential Information of the other Party for any other use or purpose at any time.

14.4 <u>Limited Reproduction</u>. No Party shall copy or otherwise reproduce the Confidential Information of the other Party for any purpose without the prior written authorization of the other Party; provided that a reasonable number of copies may be made by the Receiving Party solely to the extent necessary for the performance of its obligations herein. However, the Receiving Party shall have the burden of proving such authorization and/or necessity.

14.5 <u>Authorized Disclosure</u>. In the event that the Receiving Party is requested or ordered in any legal proceeding to disclose any of the Confidential Information of the other Party, the Receiving Party shall not make any such disclosures without the prior written authorization of the other Party in the case of a request, or without prompt prior written notice to the other Party in the case of an order. The Receiving Party shall provide the other Party with prompt notice of any such requests or orders and shall cooperate with such independent steps to attempt to resist or narrow such requests or orders, or to attempt to obtain appropriate protective orders or other assurances of nondisclosure that the other Party elects.

14.6 <u>Injunctive Relief</u>. Both Parties agree that a monetary remedy for a breach or violation of this Section will be inadequate and will be impracticable and extremely difficult to prove, and that any such breach or violation would cause the other Party irreparable harm. Accordingly, in the event of any breach or violation of this Section, in addition to any other available rights and remedies at law or in equity, said other Party shall be entitled to temporary and permanent injunctive relief and other equitable relief without the necessity of posting a bond or making any undertaking in connection therewith and without the necessity of proving actual damages.

14.7 <u>Third Party Rights</u>. In addition to the foregoing, neither Party shall communicate any information to the other in violation of the proprietary rights or trade secrets of any third party.

14.8 <u>Duration</u>. These confidentiality restrictions shall lapse with respect to any particular item of Confidential Information seven (7) years after the initial disclosure of such Confidential Information by the Disclosing Party to the Receiving Party.


**15. Audit.**

Publisher agrees that at all times during the term of this Agreement it shall maintain accurate books and records relating to its use of the Creative Content and Suppression Lists. Accordingly, it is understood that Company, or any designee of Company that is legally bound to obligations of confidentiality and non-disclosure, shall have the right during the term of this Agreement, and for a period of six (6) months thereafter, to reasonably examine, inspect, audit and review all such books, records and any source documents used in the preparation thereof during normal business hours upon written notice to Publisher at least seven (7) business days prior to the commencement of any such examination, inspection, review or audit. Such audit shall be at Company's sole

cost and expense and shall be strictly limited to those books and records that specifically relate to Publisher's use of the Creative Content and Suppression Lists. Notwithstanding the foregoing, if Company uncovers any material misconduct associated with Publisher's use of the Creative Content and/or Suppression Lists, then the audit shall be at the sole cost and expense of Publisher.

**16. Limitation of Liability; Disclaimer of Warranty.**

IN NO EVENT SHALL COMPANY BE LIABLE TO PUBLISHER OR TO ANY THIRD PARTY (INCLUDING, WITHOUT LIMITATION, ANY CUSTOMERS OBTAINED THROUGH PUBLISHER'S MARKETING EFFORTS) FOR ANY DAMAGES OF ANY KIND ARISING FROM PUBLISHER'S USE OF THE NETWORK AND/OR ITS DISPLAY OF ANY CREATIVE CONTENT ON PUBLISHER WEBSITES, INCLUDING, BUT NOT LIMITED TO, SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, EXEMPLARY AND/OR CONSEQUENTIAL DAMAGES, EVEN IF COMPANY HAS BEEN ADVISED IN WRITING OF THE POSSIBILITY OF SUCH DAMAGES. COMPANY'S MAXIMUM AGGREGATE LIABILITY TO PUBLISHER AND/OR TO ANY THIRD PARTY UNDER ANY AND ALL CIRCUMSTANCES SHALL BE THREE HUNDRED DOLLARS ($300). REGARDLESS OF ANY LAW TO THE CONTRARY, NO ACTION, SUIT OR PROCEEDING SHALL BE BROUGHT AGAINST COMPANY MORE THAN ONE (1) YEAR AFTER THE DATE UPON WHICH THE CLAIM AROSE. PUBLISHER HEREBY ACKNOWLEDGES AND AGREES THAT THIS LIMITATION OF DAMAGES IS FAIR AND REASONABLE.

DUE TO THE NATURE OF INTERNET AVAILABILITY AND ACCESSIBILITY, COMPANY CANNOT GUARANTEE THAT THERE WILL BE NO DOWNTIME OR OTHER INTERRUPTIONS IN SERVICE REGARDING THE PROGRAM. WITHOUT LIMITING THE FOREGOING, THE PROGRAM AND BY EXTENSION, THE NETWORK AND ALL CREATIVE CONTENT ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTY OF ANY KIND. ACCORDINGLY, COMPANY MAKES NO WARRANTIES, EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, AND EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF TITLE, NON-INFRINGEMENT OF INTELLECTUAL PROPERTY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND: (I) THAT THERE ARE NO VIRUSES OR OTHER HARMFUL COMPONENTS THEREIN; (II) THAT ITS SECURITY METHODS WILL BE SUFFICIENT IN ALL CIRCUMSTANCES OR IN THE FACE OF ALL POTENTIAL ATTACKS; OR (III) REGARDING THE CORRECTNESS, ACCURACY, OR RELIABILITY OF ANY INFORMATION SET FORTH HEREIN OR THEREON. THE PROGRAM AND BY EXTENSION, THE NETWORK AND ALL CREATIVE CONTENT ARE PROVIDED WITH ALL FAULTS AND MAY CONTAIN BUGS, ERRORS, PROBLEMS OR OTHER LIMITATIONS. ACCORDINGLY, THE ENTIRE RISK, AS TO SATISFACTORY QUALITY, PERFORMANCE, ACCURACY, ENJOYMENT AND EFFORT IS WITH

THE PUBLISHER. COMPANY HAS NO LIABILITY WHATSOEVER TO PUBLISHER OR TO ANY THIRD PARTY, FOR PUBLISHER'S USE OF OR INABILITY TO USE THE NETWORK AND COMPANY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS AND IMPLIED, THAT PUBLISHER'S USE OF THE NETWORK WILL BE UNINTERRUPTED OR ERROR-FREE OR THAT ANY OF THE CREATIVE CONTENT WILL BE AVAILABLE TO PUBLISHER.

THE NEGATION OF DAMAGES SET FORTH HEREIN IS A FUNDAMENTAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN COMPANY AND PUBLISHER. ACCORDINGLY, THE NETWORK AND ALL CREATIVE CONTENT WOULD NOT BE PROVIDED TO PUBLISHER WITHOUT SUCH LIMITATIONS. COMPANY MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT TO ANY RESULTS OBTAINABLE THROUGH THE PROGRAM. ACCORDINGLY, NO ADVICE OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED BY PUBLISHER FROM COMPANY AND/OR ANY ADVERTISER BY AND THROUGH THE NETWORK SHALL CREATE ANY WARRANTY, REPRESENTATION AND/OR GUARANTEE NOT EXPRESSLY STATED WITHIN THIS AGREEMENT. SOME STATES LIMIT THE ABILITY TO DISCLAIM ALL WARRANTIES, SO THIS SECTION OR SOME PORTIONS OF IT MAY NOT APPLY.

Company makes no representations or warranties and disclaims any responsibility and/or liability, regarding the content or nature of any Campaign or Creative Content made available in connection with participation in the Program. Company has no liability to Publisher for unapproved materials, including all copy, images, URL names, and search terms used by Publisher. Company makes no representations or warranties about any other third party website which Publisher may access in connection with its participation in the Program. When Publisher accesses a third party website that is not associated with and is independent from Company, Publisher hereby acknowledges and agrees that Company has no control over the content of that website. Furthermore, a link to a non-Company website does not mean that Company endorses or accepts any responsibility for the content or the use of such website. It is Publisher's sole responsibility to take precautions to ensure that websites, downloads, attachments, and other such files are free of Trojan horses, worms, viruses and/or other items of a destructive nature.

**17. Indemnification.**

Publisher hereby acknowledges and agrees to indemnify, defend and hold harmless Company, its parents, affiliates, and each of their respective officers, directors, partners, members, managers, employees, agents and attorneys, from and against any and all liabilities, claims, actions, suits, proceedings, judgments, fines, damages, costs, losses and expenses (including reasonable attorneys' fees, court costs and/or settlement costs) arising from or related to: (i) Publisher's breach of this Agreement and/or any representation or warranty contained herein; (ii) the Publisher Website(s), Publisher Database, and/or Publisher's other marketing practices; (iii) any third party allegation or claim against Company relating to a violation of any Laws and/or Regulations; (iv) any

allegation that Publisher has infringed upon the trademark, trade name, service mark, copyright, license, intellectual property or other proprietary right of any third party; (v) any non-Advertising Campaign related content, goods or services offered, sold or otherwise made available by Publisher on and through the Publisher Website(s), Publisher Database or otherwise; (vi) any claim that Company is obligated to pay any taxes in connection with Publisher's participation in the Program ; and/or (viii) Publisher's participation in the Program , in any manner whatsoever. Accordingly, Publisher shall promptly assume such defense with counsel reasonably acceptable to Company upon written notice to Publisher of such indemnifiable claim. Additionally, Company reserves the right to participate in the defense at its sole expense. Publisher agrees not to settle any indemnifiable claim without the prior written approval of Company. Publisher shall immediately notify Company of any current, impending, or potential legal actions, complaints, inquiries or investigations against it by a third party for matters relating to Publisher Website(s), Publisher Database, e-mail complaints, e-mail deployment, violations of CAN-SPAM (or other applicable regulations), or any other violations in connection with Publisher's business whether or not Publisher is obligated to indemnify Company for such claim hereunder.

**18. Non-Solicitation.**

18.1 Network Advertiser Non-Solicitation. Publisher recognizes that in addition to Company's proprietary relationships with other publishers, Company also has proprietary relationships with all of the Advertisers that participate in the Network ("Network Advertisers"). Publisher hereby acknowledges and agrees that Publisher will not circumvent Company's relationship with any such Network Advertisers, or otherwise offer, approach, induce, solicit, make available, provide, contract for or otherwise perform, directly or indirectly, advertising, marketing or promotional services similar to the services performed by Publisher pursuant to this Agreement for any Network Advertiser during the term of this Agreement and then for a one (1) year period following termination or expiration of this Agreement. Based upon the foregoing, Publisher hereby acknowledges and agrees that, in the event of any breach by Publisher, directly or indirectly, of the foregoing restrictions, it will be difficult to ascertain the precise amount of damages that may be suffered by Company as a result of such breach; and accordingly, Publisher agrees that, as liquidated damages (and not as a penalty) with respect to any such breach, Publisher shall be required to provide an accounting of any and all benefits received or derived, either directly or indirectly, by Publisher as a result of any such breach, and Publisher thereafter shall be required to pay to Company, cash amounts equal to fifty percent (50%) of the gross payments made to Publisher in violation of this Section, as damages. Finally, the Parties agree that the foregoing constitutes a fair and reasonable estimate of the actual damages that might be suffered by reason of any breach of this Section by Publisher, and the Parties agree to such liquidated damages in lieu of any and all other measures of damages that might be asserted with respect to any such breach. Notwithstanding the foregoing, to the extent that Publisher can show that if any such Advertiser has already obtained any such services from Publisher prior to the effective date of this Agreement, then Publisher

shall not be in breach of this Agreement and shall not be otherwise prohibited from continuing any such relationship.

18.2 <u>Employee Non-Solicitation</u>. Both Parties agree that, to the fullest extent permitted by law, neither Party shall, without the prior written authorization of the other, either during, or within twelve (12) months of the termination or expiration of this Agreement, engage, employ or otherwise solicit for employment whether directly or indirectly, any person who during the duration of this Agreement was an employee or was in any way compensated by the other Party. If either Party breaches this clause, the breaching Party agrees to pay the non-breaching Party a fee equal to fifty percent (50%) of the gross annual compensation package, including any quantifiable bonuses or incentives ("Recruitment Fee") paid by the non-breaching Party to that employee prior to his departure. Furthermore, both Parties agree that this Recruitment Fee shall be payable within thirty (30) days of the commencement of the employee's employment start-date with the breaching Party.

**19. Conflict of Terms.**

If there is a conflict between any of the Terms and Conditions of this Agreement and either: (i) a previous version of this Agreement; (ii) any and all prior oral or written agreements or understandings between the Parties as to the subject matter of this Agreement; (iii) any and all additional terms found throughout the Website; or (iv) any Company invoice, then the terms of this Agreement shall, in all instances, govern, prevail and control.

**20. Miscellaneous.**

20.1 <u>Good Faith</u>. Both Parties represent and warrant to the other that it has acted in good faith in the negotiation, formation and execution of this Agreement, and agree to continue to so act, in the performance of all obligations under this Agreement.

20.2 <u>Entire Agreement</u>. Both Parties agree that this Agreement is the complete and exclusive statement of the mutual understanding of the Parties and supersedes and cancels any and all previous written and oral agreements, communications and/or other understandings relating to the subject matter of this Agreement. The Terms and Conditions of this Agreement may be modified by Company from time-to-time in its sole discretion. Publisher agrees that any participation by Publisher in the Program and/or use of the Network after any such Modifications have been posted on the Network shall be deemed to be continued and complete acceptance of this revised Agreement. Except as set forth herein, no conditions other than those set forth under this Agreement, or amendments or modifications to this Agreement, shall be binding on Company unless and until Company expressly agrees in a signed writing by an authorized Company representative.

20.3 <u>Modification</u>. No waiver, amendment or modification of any provision of the

Terms and Conditions of this Agreement (including any exhibits or schedules) shall be effective unless in writing and signed by authorized representatives of both Parties. No waiver by any Party of a breach or violation of this Agreement or any failure to exercise any right hereunder shall operate or be construed as a waiver of any subsequent breach or violation of the same or of a different kind or a relinquishment of such right.

20.4    Construction. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any Party hereto by reason of such Party having or being deemed to have structured or drafted such provision.

20.5    Governing Law; Arbitration of Disputes. This Agreement shall be treated as though it were executed and performed in New York, New York and shall be governed by and construed in accordance with the laws of the State of New York (without reference or regard to principles of conflicts of law). Any and all disputes arising under this Agreement shall be settled by binding arbitration utilizing a retired judge mutually selected by the Parties and conducting under the auspices of JAMS/Endispute (or its successor or any similar service), and shall include the right to conduct discovery pursuant to the rules of Civil Procedure for New York courts. Such arbitration shall be conducted in New York County and any decision and/or award may be entered in any court of competent jurisdiction. Nothing herein shall be construed to preclude any Party from seeking injunctive relief in order to protect its rights pending an outcome in arbitration.

20.6    Performance. Company's performance of this Agreement is subject to existing laws and legal process, and nothing contain herein shall alleviate Company's right to comply with governmental, court and law enforcement requests or requirements relating to Publisher's use of the Network or information provided to or gathered by Company with respect to such use.

20.7    Injunctive Relief. Both Parties agree that its breach of this Agreement would cause irreparable injury to the other for which monetary damages are not an adequate remedy. Accordingly, both Parties are entitled to injunctive relief and other equitable remedies in the event of a breach of this Agreement, without the necessity of posting a bond. The availability of injunctive relief shall be a cumulative and non-exclusive remedy.

20.8    Attorney's Fees. In the event of any legal action or proceeding arising out of the Terms and Conditions or subject matter of this Agreement, the prevailing Party in said action or proceeding shall be entitled to recover from the other Party the costs and expenses incurred therein, including reasonable attorneys' fees and expert witness fees.

20.9    Authorization. Whenever the authorization of a Party is required herein, such authorization may be granted or withheld by such Party in its sole discretion, and if granted, may be granted upon such additional terms or conditions as the granting

Party may determine in its sole discretion.

20.10   Force Majeure. Neither Party shall be liable for, or shall be considered to be in breach of the Terms and Conditions of this Agreement on account of any delay or failure to perform as required herein as a result of any causes or conditions that are beyond such Party's reasonable control and that such Party is unable to overcome through the exercise of commercially reasonable efforts. If any force majeure event occurs (which shall include, without limitation, telecommunications, Internet or Network failure, results of computer hacking, acts of God, fire, explosion, vandalism, storm or other natural occurrences, any conflicting order, direction, action or request of the United States government (including, without limitation, state and local governments) or of any regulatory department, agency, commission, court, bureau, corporation or other instrumentality, or of any civil or military authority, national emergencies, insurrections, riots, wars, strikes, lockouts, work stoppages or other such labor difficulties), the affected Party shall provide prompt written notice to the other Party and shall use commercially reasonable efforts to minimize the impact of such event. Notwithstanding the foregoing, the Parties' obligations to the other shall be excused and/or postponed during and only for the duration of the applicable force majeure event and shall resume as soon as practicable after the force majeure event has ended.

20.11   Claims for Breach. To the fullest extent permitted by applicable law and notwithstanding any applicable statute of limitations, the Parties agree that any claims for breach of this Agreement must be brought within one (1) year of the date that the aggrieved Party first has notice of the existence of such breach.

20.12   Interference. Any attempt by any individual, whether or not the Publisher specifically referenced herein, to damage, destroy and/or otherwise tamper or interfere with the operation of the Program or the Network, is a violation of both civil and criminal law. Accordingly, Company shall diligently pursue any and all remedies in this regard against any offending individual or entity to the fullest extent permissible by law and in equity.

20.13   Assignment. This Agreement shall bind and inure to the benefit of each Party's permitted successors and assigns. Company may assign this Agreement, or any portion thereof, at its sole discretion. However, Publisher may not assign, delegate or otherwise transfer the benefit or burden of all or any part of this Agreement without the prior written authorization of Company, which may be withheld for any reason. Company agrees that such a determination of authorization shall be made in good faith and shall not be unreasonably withheld. But any attempt by Publisher to assign any part of this Agreement without the prior written authorization of Company shall be null and void.

20.14   Relationship. Company shall be retained by Publisher as an independent contractor and not as an employee, agent or representative of Publisher. No agency, partnership, joint venture, or employment is created as a result of this Agreement,

and Publisher has no authority of any kind to bind Company in any respect whatsoever.

20.15 Performance. Publisher agrees that Company may in its sole discretion engage the services of subcontractors or agents to assist Company in the performance of any of its obligations under this Agreement.

20.16 Severability. In the event that any provision of this Agreement shall be held to be unlawful or unenforceable, then the remaining provisions of this Agreement shall remain in full force and effect and shall be construed to give the fullest effect to the intent of the Parties expressed herein.

20.17 Third Party Links. Publisher agrees that any third party linked sites available via the Network are not under Company's control. Company merely provides these third party links as a convenience and the publishing of any third party link does not in any way imply endorsement by Company of the linked website and/or any association with its operators. Accordingly, Publisher agrees that Company is not responsible for the contents or operation of such third party linked websites or any links contained within such third party linked websites.

20.18 Right to Make Reference. Company may include Publisher's name and/or logo within its Website and/or throughout its promotional materials. Similarly, Publisher may use Company's name and/or logo on its Publisher Websites. However, Publisher agrees that it shall not create, publish, distribute or permit any written material that makes reference to Company without first obtaining written authorization. Additionally, neither Party grants to the other any title, interest or other right in any Marks under this Agreement.

20.19 Counterparts. This Agreement may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument.

20.20 Interference. Publisher shall not be permitted to use any devise, software or routine to interfere or attempt to interfere with the proper working of the Network. Additionally, Publisher shall not be permitted to take any action that imposes an unreasonable or disproportionately large load on the Network. Publisher further acknowledges and agrees that any unauthorized and/or unlawful use of the Network would result in irreparable injury to Company for which monetary damages would be inadequate. Accordingly, in such event, Company shall have the right, in addition to other remedies available to it pursuant to this Agreement, to immediate injunctive relief against Publisher without the need to post a bond.

20.21 Electronic Signatures. Publisher agrees that by clicking on the button labeled "Submit" (or such similar links as may be designated by Company to accept the Terms and Conditions of this Agreement), Publisher is submitting a legally binding electronic signature and is entering into a legally binding contract. Accordingly,

Publisher agrees that Publisher's electronic submissions constitute Publisher's agreement and intent to be bound by all of the Terms and Conditions of this Agreement. Pursuant to any applicable statutes, regulations, rules, ordinances or other laws, including without limitation the United States Electronic Signatures in Global and National Commerce Act, P.L. 106-229 (the "E-Sign Act") or other similar statutes, Publisher hereby acknowledges and agrees to THE USE OF ELECTRONIC SIGNATURES, CONTRACTS, ORDERS AND OTHER RECORDS AND TO ELECTRONIC DELIVERY OF NOTICES, POLICIES AND RECORDS OF TRANSACTIONS INITIATED OR COMPLETED THROUGH THE NETWORK OR IN CONNECTION WITH THE PROGRAM. Additionally, Publisher hereby waives any rights or requirements under any statutes, regulations, rules, ordinances or other laws in any jurisdiction which require an original signature or delivery or retention of non-electronic records, or to payments or the granting of credits by other than electronic means.

20.22 <u>Notices</u>. All notices relating to this Agreement shall be made in writing and deemed effective: (i) upon delivery when delivered in person; (ii) upon transmission when delivered by email; or (iii) when delivered by registered or certified mail, postage prepaid, return receipt requested or by nationally-recognized overnight courier service to: (a) Publisher at the address provided during registration; and (b) Company at 106 East 19th Street, 8th Floor, New York, NY 10003.

Copyright © 2008-2011 AD1 Media Group, LLC – All Rights Reserved.

Last updated: December 14, 2010, 5:00 p.m. EST